TRINITY CHURCH IN THE CITY OF BOSTON *vs.* JOHN HANCOCK
MUTUAL LIFE INSURANCE COMPANY & others.[1]

Suffolk. September 9, 1986. — January 15, 1987.

Present: WILKINS, LIACOS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Damages*, Special purpose property, Replacement or reconstruction of build-
ing, Future damages. *Value. Evidence*, Value. *Practice, Civil*, Objection
to jury instructions, Waiver. *Limitations, Statute of. Waiver. Words*,
"Claim."

In determining the sum recoverable for structural damage to a church,
resulting when its foundation was undermined due to failure of the
excavation system at a nearby site on which an office tower was being
constructed, it was reasonable to quantify these damages as a percentage
of the present estimated cost of dismantling the church and reconstructing
it, where the plaintiff had offered evidence tending to prove the extent
of the incremental damage the church had suffered during the relevant
period, expressed as a percentage of the extent of damage that would
require, at some future time, that the church be dismantled and recon-
structed. [48-51] O'CONNOR, J., dissenting.

In an action seeking recovery for structural damage to a church, the judge
correctly instructed the jury that, where diminution in the market value
of a piece of property is not ascertainable, damages are to be measured
in terms of the reasonable cost of replacement or reconstruction, and
the judge's charge fairly incorporated the principles that not only must
such cost be reasonable but, in addition, replacement or reconstruction
itself must be reasonably necessary in light of the damage inflicted.
[51]

In an action seeking recovery for structural damage to a church, the judge
acted correctly in excluding evidence regarding reduction of "future
damages" to their present value, and in declining to instruct the jury as
to such a reduction, where the methodology employed by the plaintiff
at trial had been devoted to setting a present dollar value for damage
suffered, which would be unaffected by the fact that the repairs would
not be undertaken until some future time. [51-53]

[1] The other defendants are Gilbane Building Company, Jeremiah Sullivan
& Sons, Inc., Spencer, White & Prentis, Inc., Carter Pile-Driving Inc.,
Max Phillipson & Associates, Inc., I. M. Pei and Partners, and Mueser,
Rutledge, Wentworth & Johnston.

The jury in a civil action could not reasonably have concluded that a statement to the plaintiff's attorney by an attorney for an insurer, to the effect that the insurer "defends all parties," amounted to a waiver of the statute of limitations on behalf of seven of the eight defendants, where there was no evidence that this statement was made in the context of a waiver discussion, and where the remaining defendant, which was the only one that the attorneys had mentioned directly in connection with a waiver, had consented specifically that a waiver be given. [53-54]

A "tacit understanding," between a plaintiff's attorney and an insurer's attorney, to the effect that the insurer "was the claims adjusting agent for all of the parties" did not amount to the assertion of a claim by the plaintiff against seven of the eight defendants in a civil action, with the result that, as to these defendants, the running of the statute of limitations was not tolled by the insurer's failure to comply with G. L. c. 231, § 140B, requiring that, in making advance payments to a claimant, it give written notice of the statute of limitations applicable to the claim. [55-56]

Defendants in a civil action, once they had properly pleaded the statute of limitations in their answers, were entitled to wait until immediately prior to trial before filing a motion based on this defense. [56]

CIVIL ACTION commenced in the Superior Court on January 29, 1975.

The case was tried before *James J. Nixon*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Anthony E. Battelle* (*James D. Smeallie & Robert M. Ruzzo* with him) for the plaintiff.

*Robert M. Hacking* (*Calum B. Anderson & Leonard F. Zandrow, Jr.*, with him) for John Hancock Mutual Life Insurance Company & others.

*Richard W. Renehan* (*Jane S. Schacter* with him) for I.M. Pei and Partners.

*Raymond J. Kenney, Jr.*, for Mueser, Rutledge, Wentworth & Johnston, was present but did not argue.

LYNCH, J. This case arises out of property damage sustained by the plaintiff, Trinity Church in the City of Boston, during construction of the John Hancock Tower Building in Copley Square. On January 29, 1975, the plaintiff filed a complaint against John Hancock Mutual Life Insurance Company and

seventeen other defendants involved in the construction of the Hancock tower. At the defendants' request the claims against the eight defendants to the present action for excavation-related damages were tried separately from the fallen object claims.[2] This appeal concerns only the counts related to the defendants' excavation activities.

At the close of Trinity's evidence, the trial judge denied Hancock's motion for a directed verdict but allowed the motions for directed verdicts raised by the seven other defendants. Following jury verdicts for the plaintiff on three counts in the sum of $4,170,300, Hancock appealed.[3] Trinity subsequently appealed from the judgment dismissing the claims against the seven other defendants. The appeals have been consolidated and we granted direct appellate review. We affirm.

There was evidence from which the jury could have found the following facts. Trinity Church was designed by Henry Hobson Richardson in 1872 and completed in 1876. It is considered by scholars to be one of Richardson's greatest works. Today, Trinity Church is a national historic landmark as well as a functioning church.

Trinity Church is constructed almost entirely of stone masonry. Stone masonry is heavy and very brittle compared to other construction materials; when placed under stress it does not deform, but it cracks. When stone masonry cracks, it characteristically breaks throughout its entire thickness, and its strength diminishes significantly. Ordinarily it cannot be repaired except by disassembly, resetting, and reconstruction. The foundation of the church rests atop more than 4,500 pilings and four massive granite pyramids which support the church's main tower.

Since its completion, the church experienced settlement or movement as the layers of subsurface soil upon which it rests have shifted and compressed. Trinity began taking periodic

---

[2] These claims have yet to be tried.

[3] The jury returned identical verdicts of $4,170,300 on each of three counts sounding in negligence, nuisance, and strict liability. Approximately $3.6 million of the verdicts represents compensation for structural damages. The addition of interest more than doubles the award.

surveys to measure this settlement in 1918. Between 1918 and 1968, six measured areas of the church had experienced settlement of between three and four inches.[4]

During construction of the Hancock tower, the foundation of the church was undermined by a failure of the excavation system at the Hancock site. As work was being performed on the excavation system, the ground immediately surrounding the construction site moved inward toward the excavation.[5] This caused the foundation of the church to settle unevenly, most dramatically on the south side closest to the tower site, and to migrate horizontally toward the Hancock tower excavation. This settlement produced a spray of cracks up through the masonry walls of the church which affected the structural integrity of the church.[6]

---

[4] According to Trinity, most of the pre-1968 settlement was uniform which, while it may change the location or tilt of a structure, causes no structural damage because it causes no distortion of the building itself. In contrast, between 1968 and 1972, the church experienced a large amount of "differential" settlement, defined at the trial as the nonuniform movement which occurs when portions of a structure settle or shift at different rates, thus producing cracking and increased stresses in a building.

[5] For example, the south curb of St. James Avenue, which separates the church from the Hancock property, settled vertically by eighteen inches. The north curb of St. James Avenue, twenty feet from the church, settled vertically by nine to ten inches and moved laterally toward the excavation by eight to nine inches.

[6] The record shows that as a result of the settlement the south transept of the church was broken in three locations, with each part no longer structually connected to the other. The north and south transepts were separated from the centrally located main tower, so that these three units of the building are no longer structually connected as well. In addition, the settlement associated with the Hancock tower construction caused two large cracks to appear through the double masonry walls of the west facade, breaking the facade into three separate parts. The main tower, one of the church's central elements, is supported by four great pyramids resting over the church's foundation. During the Hancock construction the two southern pyramids settled to a greater degree than the two northern pyramids, and have rotated so that the southern edges settled more than those on the north side. This has caused the tower to tilt toward the Hancock site, and induced approximately twice the amount of preexisting stress across the main arches that sit across the top of the four pyramids.

399 Mass. 43                                                      47

Trinity Church in the City of Boston *v.* John Hancock Mutual Life Ins. Co.

Although some evidence suggested that minor damage to the church may have occurred in April or May of 1969, there was no evidence introduced to indicate that these damages were causally related to the tower construction. In a letter dated September 22, 1969, one of Hancock's engineers after analyzing current survey data denied that there was any evidence of lateral movement of the church. By December 22, 1969, however, it was clear some settlement of the church related to the Hancock construction project had occurred and Hancock so informed the church's engineer two days later. Several meetings between representatives of Trinity, Hancock, and CNA Insurance, Hancock's insurer, and the seven other defendants followed.

The subject of the statute of limitations was first raised at a meeting on December 1, 1971, attended by Mr. F. Stanton Deland, Jr., an attorney representing Trinity, and Mr. John G. Burke, a claims attorney for CNA. Mr. Deland testified that Mr. Burke indicated at this meeting that "CNA defends all parties," although Mr. Burke recalled no statement to that effect. At this time Mr. Deland was aware of the approaching statute of limitations deadline. Mr. Burke agreed to waive assertion of the statute of limitations defense, and said that he would also seek a waiver directly from Hancock. No specific mention was made of a waiver by any party other than Hancock, and Mr. Deland sought a written waiver only from Hancock. On December 2, 1971, Mr. Deland wrote Mr. Burke to confirm the agreement reached the previous day.

Several payments from CNA were received by Trinity during settlement negotiations. Mr. Deland also sought and received enlargements of Hancock's original waiver of the statute of limitations. The last waiver of the statute of limitations issued by Mr. Burke expired on February 1, 1975. Trinity filed suit on January 29, 1975, three days before the period of the final waiver expired.

I. *Damages.*

Trinity asserted three separate damage claims related to the Hancock tower construction. At trial, Trinity sought compensation for the cost of repairing the interior and the exterior

areas of the church, as well as for the structural damages sustained. This appeal only involves the church's claim for structural damages.

Trinity based its structural damage claim on the changes which took place within the church during the time the Hancock tower was being constructed. Trinity quantified these changes in terms of a percentage of the church's ultimate "takedown" condition.

A. *The "takedown" theory of damage assessment.* The plaintiff introduced evidence to show that the level of structural damage within a masonry structure such as the church can be related directly to the amount of distortion in its foundations caused by differential settlement. The degree of differential settlement can be expressed in terms of "angles of distortion," which can be calculated directly from the settlement survey data. At a certain angle of distortion, the structural damage to a building reaches a point where disassembly and reconstruction become necessary. This ultimate level of damage is referred to as the "takedown" level of damage.

For the purpose of calculating its damage claim, angles of distortion were calculated for the years 1968 and 1972, for each section of the church for which sufficient data were available. These angles were converted into percentages of the angles which represented the "takedown" condition in the corresponding section of the church. The percentage difference before and after the tower construction was taken to represent the amount of damage caused to the building during the construction period. The final dollar value of the claim was established by applying the change in physical damage from 1968 to 1972, expressed as a percentage of the over-all takedown condition, to the estimated cost of takedown and reconstruction for each affected section.

The general rule for measuring property damage is diminution in market value. *Hopkins* v. *American Pneumatic Serv. Co.*, 194 Mass. 582, 583 (1907). However, "market value does not in all cases afford a correct measure of indemnity, and is not therefore 'a universal test.'" *Wall* v. *Platt*, 169 Mass. 398, 405-406 (1897). For certain categories of property,

termed "special purpose property" (such as the property of nonprofit, charitable, or religious organizations), there will not generally be an active market from which the diminution in market value may be determined. *Commonwealth* v. *Massachusetts Turnpike Auth.*, 352 Mass. 143, 147 (1967). *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Auth.*, 335 Mass. 189, 194-195 (1956). The parties agree that Trinity Church falls within the definition of special purpose property and that the damage to the church could not be measured on the basis of fair market value.

In such cases, this court has been cognizant of the need for greater flexibility in the presentation of evidence relating to damages and has provided "[s]pecial opportunities for proof of value . . . where it is felt that there is no market value . . . . The courts in these cases . . . may be doing no more than recognizing that more complex and resourceful methods of ascertaining value must be used where the property is unusual or specialized in character and where ordinary methods will produce a miscarriage of justice." *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Auth., supra* at 195.

In a number of situations involving special purpose property, the cost of reproduction less depreciation has been utilized as an appropriate measure of damages. See, e.g., *Roman Catholic Archbishop* v. *Commonwealth*, 364 Mass. 486 (1974) (eminent domain taking of a church); *Commonwealth* v. *Massachusetts Turnpike Auth., supra* at 148 (eminent domain taking of armory); *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Auth., supra* at 195 (eminent domain taking of Girl Scout camp). See also *Foxboro Assocs.* v. *Assessors of Foxborough*, 385 Mass. 679, 688 (1982) (reproduction cost less depreciation used to determine value of a harness raceway for real estate tax assessment purposes).

Replacement or restoration costs have also been allowed as a measure of damages in other contexts where diminution in market value is unavailable or unsatisfactory as a measure of damages. *Heninger* v. *Dunn*, 101 Cal. App. 3d 858, 864-865 (1980) (cost of replacing trees and vegetation). See *Puerto Rico* v. *SS Zoe Colocotroni*, 628 F.2d 652, 675 (1st Cir.

1980), cert. denied, 450 U.S. 912 (1981) (cost of restoring area affected by an oil spill); *Maloof* v. *United States*, 242 F. Supp. 175, 183 (D. Md. 1965) (cost of replacing trees and vegetation). See generally Restatement (Second) of Torts § 929 (1)(a) (1979). Where expenditures to restore or to replace to predamage condition are used as the measure of damages, a test of reasonableness is imposed. Not only must the cost of replacement or reconstruction be reasonable, the replacement or reconstruction itself must be reasonably necessary in light of the damage inflicted by a particular defendant. In some cases, "to make such a restoration would be an uneconomical and improper way of using the property" and "might involve a very large and disproportionate expense to relieve from the consequences of a slight injury." *Hopkins* v. *American Pneumatic Serv. Co.*, *supra* at 584. See also *Puerto Rico* v. *SS Zoe Colocotroni, supra* ("There may be circumstances where direct restoration of the affected area is either physically impossible or so disproportionately expensive that it would not be reasonable to undertake such a remedy"); *Maloof* v. *United States, supra* (applicable measure of damages is "the *reasonable* cost of restoring the property as nearly as *reasonably* possible to its [original] condition" [emphasis in original]).

Trinity is entitled to be compensated for the reasonable costs of restoring the church to the condition it was in prior to the Hancock excavation. Trinity's method of damage assessment meets the test of reasonableness by quantifying the amount of the incremental damage sustained between 1968 and 1972. For example, in the south transept, the most heavily damaged section of the church, Trinity estimated a total takedown and reconstruction cost of $1,724,457. By 1972, the south transept had reached a level of damage equivalent to sixty-five per cent of its takedown condition, compared to a 1968 level of damage of twenty-six per cent. Multiplying the increase of thirty-nine per cent by the total reconstruction cost of the south transept, Trinity arrived at its claim of $672,538 for structural damages in this section of the church.

It is useful to consider Trinity's method with a view toward the impact of future damage. If at some time in the future

399 Mass. 43                                            51

Trinity Church in the City of Boston *v.* John Hancock Mutual Life Ins. Co.

another construction project damaged the church causing it to reach its "total loss" or takedown point, the church would clearly be entitled to recover the depreciated reconstruction cost. Depreciation at that point, however, would include all the damage sustained up to that time, including that related to the Hancock tower construction. For this reason, unless Trinity is compensated for the Hancock related damages now, these damages will forever pass into the realm of nonrecoverable depreciation.

The plaintiff's method of damage assessment, based upon a percentage of reconstruction cost, is consistent with the depreciated-cost-of-reconstruction standard applicable to special purpose property cases. We conclude that Trinity's method of proving damages is an acceptable measure of the amount of damage reasonably attributable to the defendant's acts.

B. *Jury charge.* The judge correctly instructed the jury that, where the diminution in market value is not ascertainable, damages were to be measured in terms of the reasonable cost of repairs, and that cost of repairs means the amount of money which is the fair and reasonable cost of returning the property to the condition it was in prior to the infliction of the damages. We think this instruction fairly incorporated both concepts of reasonableness discussed above. Hancock objected to the instruction, but on the ground that the charge did not define damages to "indicate that the cost of repair had to be necessary repairs." Even if the judge had improperly instructed on the standard of reasonableness to be applied, this objection was not sufficient to raise the question, because it cannot be said to have brought that issue to the judge's attention as required by Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974). *Cooke* v. *Walter Kidde & Co.*, 8 Mass. App. Ct. 902, 904 (1979). *E & V Truck Leasing, Inc.* v. *Ennis*, 5 Mass. App. Ct. 802 (1977).

Furthermore, the bench conference makes clear that counsel's objection was to Trinity's theory of damages which, as we have said previously in this opinion, was an appropriate theory of damages in the circumstances of this case. There is no need to disturb the verdicts on the basis of the charge.

C. *Present value.* Over Hancock's objection, the judge refused to admit any evidence on or to instruct the jury regarding reducing the award of future damages to their present value. Hancock claims that it was reversible error to preclude the jury from considering the application of present value reduction to the plaintiff's claim.

In *Chesapeake & Ohio Ry.* v. *Kelly*, 241 U.S. 485, 489 (1916), the Supreme Court recognized that, unless an award for future damages is reduced to present value, the award will, with interest, exceed the sum of the plaintiff's future damages. The concept of present value has been applied in Massachusetts solely to future losses or to expenses involving personal injury claims. See, e.g., *Griffin* v. *General Motors Corp.*, 380 Mass. 362, 367 (1980) (judge should "instruct the jury to reduce future damages . . . to their value 'at the date of commencement of the action' "); *Carey* v. *General Motors Corp.*, 377 Mass. 736, 746 (1979) (not erroneous for judge to instruct jury to "award the present value of a sum sufficient to compensate the plaintiff for future loss"). While no Massachusetts case establishes that recovery for future property loss or repair must be discounted to present value, there is no reason to limit application of the principle to personal injury claims. See Restatement (Second) of Torts § 911 comment j (1979) ("in actions for physical harm, such as damage to property, the fact that the purchasing power of money has lessened or increased since the injury may be relevant").

Hancock has cited only one case to have expressly held that present value reduction principles apply in the area of property damage. In *Rhode Island Turnpike & Bridge Auth.* v. *Bethlehem Steel Corp.*, 119 R.I. 141, 168 (1977), the Supreme Court of Rhode Island addressed the question of the proper value of damages for future engineering and paint repairs to a bridge. The court recognized that while the injury to the plaintiff was a present one, in the sense that the defendant's failure to prepare properly the steel of the bridge had already occurred, the damages in the form of the need for remedial painting and engineering repairs would not occur until the future. *Id.* at 168. The court accepted the premise that "damages for future

remedial costs . . . should be discounted in consideration of the fact that the [plaintiff] will have use of the money." *Id.* The court concluded that "the award must be reduced to present worth, allowing only that sum which, with the accumulation of interest will amount to such damages as will in the future be sustained." Id. It should be noted that the decision rests in some part on the plaintiff's reliance of estimated future costs. By contrast, Trinity's theory was that all of the structural damages had occurred. The methodology it employs is to assign a present cost for repairing that damage. The fact that the theory upon which it relies assumes that the repairs will not be done until some time in the future does not compel the conclusion that it is seeking recovery for future damages. The theory attempts to set a present dollar value for damages which have occurred but which will not be repaired until some time in the future. An injured party is not required to perform repairs in order to recover for diminution in market value of its property. Trinity presents a reasonable alternative to the diminution-of-market-value approach to damages in a situation where market value cannot be established.

II. *Statute of Limitations.*

The judge allowed the motions for directed verdicts of the seven defendants (all except Hancock) on the basis that the claims were barred by the statute of limitations.[7] It is clear that the judge was correct unless there was a waiver or a statutory bar to the application of the statute of limitations. Trinity concedes that no waiver was given on any party's behalf before December, 1971. Trinity contends, however, that the jury could reasonably have concluded that Trinity did not have notice of the structural damage which forms the basis of its claim until December 24, 1969. Even if we assume this to be so, Trinity's claims against these defendants were nonetheless time-barred when filed, because there was no evidence that would warrant a finding of waiver by any party other than Hancock.

---

[7] All parties agree that the statute of limitations applicable to Trinity's claim was the two-year period then prescribed by G. L. c. 260, § 2B, inserted by St. 1968, c. 612.

It is undisputed that the seven defendants never directly waived the statute of limitations, nor was there any evidence that they were ever mentioned in the settlement negotiations. However, Trinity maintains that in negotiations with the church on December 1, 1971, the CNA claims attorney assigned to the case waived the statute of limitations defense on behalf of all defendants. Trinity bases this claim on the testimony of Mr. Deland, the attorney representing Trinity, who testified that Mr. Burke stated to him that "CNA defends all parties." There is no evidence that this statement was made in the context of a waiver discussion. During the settlement negotiations it was never established who "all parties" were. Moreover, Mr. Deland never testified that Mr. Burke said he would waive the statute of limitations for "all parties." The only party ever mentioned directly in connection with a statute of limitations waiver was Hancock and only the specific consent of Hancock was ever obtained by Mr. Burke in issuing a waiver. It is well settled that a waiver "is the intentional relinquishment of a known right." *Niagara Fire Ins. Co.* v. *Lowell Trucking Corp.*, 316 Mass. 652, 657 (1944). The evidence simply does not permit the inference that Mr. Burke's statement — purely general in nature — was intended, nor did in fact act, as a waiver on behalf of the defendants against whom Trinity now seeks to assert it.

In fact, it appears that Mr. Deland realized that the waiver of the statute of limitations discussed in the December 1, 1971, meeting applied only to Hancock. In a letter dated December 2, 1971, confirming the agreements reached at the previous day's meeting, Mr. Deland wrote to Mr. Burke: "You have agreed on behalf of CNA to waive the statute of limitations with respect to claims of Trinity Church against John Hancock Life Insurance Company and you will also seek to obtain a similar waiver from John Hancock as well."

Trinity relies on several letters, either included with advance payments made by CNA or extending the statute of limitations waiver agreed to by Hancock, to support its claim of a waiver. Reviewing the record, we find no evidence to support Trinity's contention that Mr. Burke's actions amounted to a waiver upon which it relied in delaying suit against the other defendants.

Trinity also contends that G. L. c. 231, § 140B,[8] provides a separate basis for tolling the limitations period against the seven defendants. It argues that the advance payments made by CNA failed to comply with the written notice requirement of § 140B, thereby tolling the statute of limitations indefinitely. Section 140B is triggered only where there has been a "claim or suit for damages" made against a party to whom the provisions refer. Trinity does not argue that it made a direct claim against any of the seven defendants in question; instead, it maintains that it transmitted its claim against those defendants through Burke, the CNA claims attorney.[9] However, Trinity is unable to point to a single statement by any Trinity representative indicating that the church was looking to anyone but Hancock for damages. Without such a statement, Trinity can claim only a "tacit understanding that the CNA was the claims adjusting agent for *all* of the parties involved in this appeal." According to Trinity, "[s]ince Burke acknowledged at the December, 1971, meeting that he defended all parties, Trinity's dealings with Burke amounted to a claim against all defendants."

Giving the word "claim" its ordinary meaning and approved usage, see generally *Conroy* v. *Boston*, 392 Mass. 216, 219 (1984), it is clear that "tacit understanding" cannot constitute a claim. Upon the facts presented, there is no way Burke or any other CNA official could have known which, if any, of

---

[8] General Laws c. 231, § 140B (1984 ed.), provides, in relevant part: "Any such insurer who makes an advance payment under this section shall at the time of making such payment, by notice in writing, inform the claimant of the statute of limitations applicable to his claim and the time within which an action is required to be commenced to enforce such claim in a court of competent jurisdiction.

"The cause of action of any claimant who receives an advance payment under this section but who is not given the written notice required hereunder shall accrue on the date such written notice is actually given and not on the date the injury or damage was sustained."

[9] Because we find § 140B inapplicable, we need not address the issue whether § 140B prohibits an insured who is not directly notified of a claim against it from raising the statute of limitations defense as long as its insurer received notice.

the other defendants Trinity had asserted a claim against. All explicit references to litigation or any other action to be commenced on Trinity's behalf were linked solely to Hancock. Further, no advance payments were made on behalf of any defendant other than Hancock. The payments in question were made in satisfaction of claims submitted by Trinity directly to Hancock. Hancock in turn forwarded the invoices to its insurer, CNA, which reimbursed Trinity for the amounts claimed.

We agree with the judge's conclusion that no claim had been made against any of the defendants other than Hancock and, therefore, that § 140B is inapplicable to the present case.

Finally, Trinity argues that the defendants' failure to act on the statute of limitations defense until immediately prior to trial constitutes a waiver and an estoppel. We do not agree.

Trinity's argument stands on its head the familiar rule that *failure* to assert an affirmative defense by way of answer (or motion) may subject a party to waiver. The defense of the statute of limitations was clearly stated in the answers of all the defendants from the onset of this litigation. The Massachusetts Rules of Civil Procedure do not compel parties to assert pleaded defenses in pretrial motions within an arbitrary time period. For any number of legitimate reasons a party might wait until well into the litigation, or until trial, to file a motion based on a duly-pleaded defense — including the desire to obtain discovery, the knowledge that a defense will depend on a triable issue of fact, or simple considerations of strategy. Where the rules impose no duty on a defendant to take additional action in order to preserve a defense, we will not create such a duty.

*Judgments affirmed.*


O'CONNOR, J. (dissenting in part). I agree with the court's affirmance of the judgments from which Trinity has appealed, but I do not agree that the judgment against Hancock should be affirmed. I do not agree that the evidence warrants an award of compensation for structural damage to the church in

addition to compensation for the cost of repairing its interior and exterior surfaces. More specifically, I do not accept the plaintiff's "takedown" theory of damages as appropriate in this case.

Damages are not appropriate simply to respond to an unsolicited alteration of real property, but are appropriate only as compensation for actual loss. In appropriate circumstances, diminution in the market value of real property constitutes compensable loss. Also, in appropriate circumstances, the loss of use of special purpose property, being rationally susceptible of measurement in terms of money, is compensable. *Commonwealth* v. *Massachusetts Turnpike Auth.*, 352 Mass. 143, 149-151 (1967). Loss of use fairly encompasses a reduction in the "life expectancy" of a building, and, therefore, such a reduction, if it results from a defendant's tortious conduct, ought to be compensable. But, the record contains no evidence of a diminution in the church's market value, or of a present loss of use or enjoyment of the church, or of even a minute shortening of its usable life. There is no evidence that the church will ever be less usable or less enjoyable than it is now, or that it ever will have to be taken down and reconstructed. Neither the court nor any party suggests otherwise. Therefore, Trinity has not sustained its burden of proving a loss based on structural damage, and an award of compensation for structural damage is improper.

Unfortunately, the court assumes without discussion that the distortion of the church's foundation and the resulting wall cracks have resulted in a loss to the plaintiff. Based on that erroneous assumption, the court concludes that "Trinity is entitled to be compensated for the reasonable costs of restoring the church to the condition it was in prior to the Hancock excavation." *Ante* at 50. Of course, the award does not purport to put the plaintiff in position to restore the church to its condition prior to the excavation, but rather it is designed to require Hancock to pay now what is deemed to be Hancock's equitable share of the cost of restoration sometime in the future should restoration ever become reasonably necessary. The award misses the mark, however, because costs of restoration,

in whole or in part, are not a proper method of measuring damages unless restoration either is, or is likely to become, reasonably necessary, and there is no such evidence in this case. The court's recognition of this principle, which it then does not follow, is demonstrated by its statement that "[n]ot only must the cost of replacement or reconstruction be reasonable, the replacement or reconstruction itself must be reasonably necessary in light of the damage inflicted by a particular defendant." *Ante* at 50. See *Commonwealth* v. *Massachusetts Turnpike Auth., supra* at 149. The court's affirmance of the judgment against Hancock, therefore, is erroneous.

In support of its holding, the court states, *ante* at 50-51: "It is useful to consider Trinity's method with a view toward the impact of future damage. If at some time in the future another construction project damaged the church causing it to reach its 'total loss' or takedown point, the church would clearly be entitled to recover the depreciated reconstruction cost. Depreciation at that point, however, would include all the damage sustained up to that time, including that related to the Hancock tower construction. For this reason, unless Trinity is compensated for the Hancock related damages now, these damages will forever pass into the realm of nonrecoverable depreciation." The court's reasoning is circuitous. It begs the primary question, which is whether the evidence demonstrates that Trinity has sustained a loss. If, as I argue, Trinity has not sustained a loss as a result of the Hancock excavation, its building has not depreciated, for loss is depreciation and depreciation is loss. If the event speculated by the court should occur, the wrongdoer will not be entitled to deduct from the reconstruction cost any depreciation attributable to Hancock because there will not be any. It is not unusual for a court to conclude in a tort case that the defendant must take the plaintiff as he finds him.

Hancock more than adequately preserved its right to appellate review of this matter. The court's holding causes a windfall to Trinity and an injustice to Hancock. Neither logic nor the law supports the structural damage award. I would reverse the judgment in favor of Trinity against Hancock, and I would

remand the case to the Superior Court for the entry of a new judgment consistent with this opinion. I would affirm the other judgments.