NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0207n.06
Filed: March 21, 2007

Case No. 05-5884

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PAUL A. LICHTEFELD, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| MACTEC ENGINEERING & | ) | DISTRICT OF KENTUCKY |
| CONSULTING, INC., | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: BATCHELDER, GIBBONS, and COOK, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. The appellant, Mactec Engineering &

Consulting, Inc. appeals a jury verdict of $175,000 in favor of its former landlord, appellee Paul

Lichtefeld. For the reasons that follow, we affirm in part, reverse in part, and remand this case to

the district court for further proceedings consistent with this opinion.

I.

This case arises in diversity, under Kentucky law. Mr. Lichtefeld, a Kentucky real estate

developer, leased a building in Louisville, Kentucky, to Mactec,[1] a Georgia corporation. During its

tenancy, Mactec allowed or caused the building to fall into disrepair, which Mr. Lichtefeld alleged

_____

[1]To be precise, Rhone-Poulenc, Inc. leased the building to Law Engineering & Environmental Services, Mactec's corporate predecessor. The defendant was referred to as Law throughout the trial stages of this action, but is referred to as Mactec on appeal. The difference is not material to this appeal, and we will refer to the defendant-appellant as Mactec. Mr. Lichtefeld purchased the building from Rhone-Poulenc in 1995 and assumed the lease at that time.

was in breach of the lease. The lease contained the following relevant provisions:

> 15. Repairs.
> (a) Tenant shall make, at its sole cost and expense, all repairs necessary to maintain any heating, plumbing, air conditioning and electrical systems located on the Premises. . . . .
> (b) Tenant shall make, at its sole cost and expense, all repairs necessary to maintain the Premises including but not limited to windows, doors, lights, fixtures, etc., and shall keep the Premises and the fixtures therein in neat and orderly condition. . . . .
>
> 24. Surrender of Premises: Holding Over.
> (a) This Lease shall terminate and Tenant shall deliver up and surrender possession of the Premises . . . . in the same condition in which Tenant has agreed to keep the same during the continuance of this Lease in accordance with the terms hereof, normal wear and tear excepted.

Near the end of the lease term, Mr. Lichtefeld was negotiating to sell the building to the Kentucky Easter Seals Society. His asking price was $2.6 million, but on inspection, Easter Seals found the building in poor condition. At trial, the Easter Seals CEO described the damage: the building was filthy and the courtyards overgrown; Mactec had broken ceiling tiles in order to run computer lines and had used large, greasy equipment in carpeted areas; the wallpaper was torn where Mactec had glued and then removed signs; Mactec had allowed caulk to deteriorate in windows overlooking a parquet wood floor, which was damaged by leaking water as a result. Because of the building's poor condition, Easter Seals made a counter-offer that was $300,000 below the asking price, and eventually spent $184,000 to refurbish the building's interior[2] and $217,000 to replace the

---

[2]When asked about the repair that Easter Seals did to the building, the Easer Seals CEO testified at trial: "We did not gut it. It is essentially as - - as it was when we found it with very few modifications. The significant modifications really were taking out a wall or two here and there and just repairing and bringing the building back up to a reasonable building. In fact, it looks from an interior perspective pretty much like it was, I would suspect, before the prior tenant [Mactec] was there. The flooring is still the same flooring for the most part, the wood, but it had had a lot of problems. We put in essentially the same ceiling tile. There is nothing extravagant at all in the building. We had to go through and kind of rediscover the little courtyards, which are nice little features, but they had become kind of a jungle. And the amount we spent bringing it up to usable standards, something that all of us would feel comfortable in, excluding any exterior stuff, which included - - that means we added a canopy and did some paving, excluding that, just what we spent on the inside bringing it up to snuff was about $184,000 more dollars."

2

HVAC system.

The HVAC system was a particular item of concern. As installed, the system had 51 thermostats that controlled the temperature of the individual offices. During Mactec's tenancy, however, Mactec had bypassed the thermostats and installed a single toggle switch so that the HVAC system produced either full heat or full air conditioning for the entire building. According to trial testimony by both Mr. Lichtefeld's Mechanical Systems Manager and an HVAC expert, this alteration placed undue stress on the system, which reduced its useful life. In addition, the constant flow of cold air through the building's ducts during the humid summer months caused condensation that stained the ceiling. To sell the building, Mr. Lichtefeld agreed to place $50,000 in escrow for repair of the HVAC system. Therefore, Easter Seals purchased the building for an effective price of $2.25 million, leaving Mr. Lichtefeld $350,000 short of his original asking price.

Mr. Lichtefeld sued Mactec, alleging that Mactec had breached its obligations under the lease. Prior to trial, Mr. Lichtefeld argued – and the district court ruled – that the proper measure of damages was *either* the cost of repair or the diminution in property value. At trial, Mr. Lichtefeld produced witnesses to testify to the extent to which the building and HVAC system had been permitted to fall into disrepair in violation of the lease. These witnesses included Mr. Lichtefeld himself, the Easter Seals CEO, the Mechanical Systems Manager, and the HVAC expert. The former Mactec office manager testified for the defense. To establish damages, Mr. Lichtefeld produced an expert real estate appraiser who testified that the building would have been worth $2.575 million at the time of the sale to Easter Seals, if it had been in even average condition. Mr. Lichtefeld, himself a licensed realtor, testified that he valued the building at $2.6 million on either a rental-income or cost-per-square-foot basis.

3

Ultimately, the jury found for Mr. Lichtefeld and awarded him $175,000 in damages based on diminution in value. Mactec moved the district court for JNOV or a new trial, which the court denied. Mactec appealed, raising many of the same issues for review on appeal.

## II.

Mactec raises six issues on appeal, five of which were fully and properly resolved by the district court. Because these five claims lack merit, we affirm the district court on each, and will address them in only a cursory manner. The sixth – the proper measure of damages – we will address in detail. We review conclusions of law *de novo* and findings of fact for clear error. *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 645 (6th Cir. 2006).

First, Mactec argues that the case must be dismissed because Easter Seals owned the building at the end of the lease term, so (1) Mr. Lichtefeld lacked standing and (2) Mr. Lichtefeld and Easter Seals entered into a champertous agreement involving this litigation. However, the district court made an express finding that "the sale of the building was not closed until after the termination of the lease," and we do not find this to be clear error. The district court correctly determined that Mr. Lichtefeld had standing because, according to his complaint, he suffered direct personal injury (i.e., loss of property value) due to Mactec's breach of the lease, for which he sought contract damages. Because Easter Seals will not share in the proceeds of this litigation, there is no champerty here.[3] Even if there were, the law would void the contract between Easter Seals and Mr. Lichtefeld; it would not void the lease or dismiss the action. *See Skinner v. Morrow*, 318 S.W.2d 419, 429 (Ky.

---

[3]Champerty is defined as "1. An agreement between an officious intermeddler in a lawsuit and a litigant by which the intermeddler helps pursue the litigant's claim as consideration for receiving part of any judgment proceeds; specif., an agreement to divide litigation proceeds between the owner of the litigated claim and a party unrelated to the lawsuit who supports or helps enforce the claim." Black's Law Dictionary (8th Ed. 2004), champerty.

1958) (*citing Aetna Life Ins. Co. v. Weck*, 173 S.W. 317 (Ky. 1915)).

Second, Mactec argues that its duty to *repair* was not a duty to *replace and upgrade,* and therefore, under the lease and as a matter of law, it cannot be held liable for failing to replace the HVAC system. Prior to trial, Mactec moved for summary judgment on this issue, and the district court held that, "the defendant's duty to repair did not require it to replace the entire air conditioning unit, although the plaintiff insists – and the court agrees – that the defendant's duty may have included the obligation to replace component parts of that unit." Mactec argued that it could not merely replace component parts because – it alleged – component parts were not available. The court considered this a genuine issue of material fact and denied summary judgment. At trial, two witnesses testified that Mactec could have obtained refurbished parts, off-brand parts, or even new parts from the manufacturer through April 2000. In rebuttal, Mactec's former office manager testified that a local service provider had told a Mactec administrative assistant that component parts were unavailable. Mactec argues that by permitting this claim to go to the jury, the district court imposed a *de facto* duty of replacement. We find no merit to this argument. The record demonstrates that the jury reasonably could have found that component parts were available and that Mactec could have maintained the system, and we conclude that the district court did not impose a *de facto* duty of replacement.

Third, Mactec alleges that this is really a negligence case and that Mr. Lichtefeld did not prove that Mactec caused damage to the building. Of course, the defendant cannot unilaterally change the nature of the case – this was and is a breach of contract case in which Mr. Lichtefeld complains that Mactec violated lease Sections 15 and 24 (quoted above). There is ample evidence in the record to support the findings that Mactec caused damage to the building and that Mr.

5

Lichtefeld suffered damage as a result. Mactec was the sole tenant during the lease period, and the record contains no evidence of natural disaster or any other entity or any event that could have caused the building to be in its state of disrepair. Mactec's failure to maintain the building properly was, of necessity, the cause of the building's poor condition. The evidence also supports a jury's finding of damage. Photos and testimony demonstrated that the premises were not neat and orderly, but were in fact filthy and damaged. In unrebutted testimony, the Easter Seals CEO testified that Easter Seals spent $184,000 to restore the building's interior – to bring it "back up to a reasonable building" – and another $217,000 to restore the "jerry rigged" HVAC. Due to the building's state of disrepair, Easter Seals purchased it for $2.25 million; $350,000 less than the $2.6 million asking price, and $325,000 less than the $2.575 million fair market value, as estimated at trial by the expert real estate appraiser. These facts support a jury finding of causation and damages in this case.

Fourth, Mactec argues that lease Section 15(b) required Mr. Lichtefeld to notify Mactec of its breach and then make the necessary repairs at Mactec's expense, which he did not do. But the plain language of Section 15(b) refutes this argument, as it provides that the landlord "may" make repairs at the tenant's expense; it does not require him to do so. In addition, Section 15(b) does not apply to the HVAC system, which was Mactec's responsibility under Section 15(a).

Fifth, Mactec argues that it cannot be held liable for the HVAC system because it retained an independent contractor to maintain the system. Mactec cites to *Miles Farm Supply v. Ellis*, 878 S.W.2d 803, 804 (Ky. App. 1994), which holds that an employer cannot be held liable for the torts of independent contractors. However, we find that law inapplicable to this case, which sounds in contract, not in tort. Mactec was obligated under the lease to maintain the HVAC system and correct any deterioration beyond normal wear and tear. Nothing in Kentucky law releases Mactec from its

6

bargained-for duty simply because it hired an outside contractor to do the work.

We find no merit to any of these assignments of error.

### III.

Mactec argues that the district court erred by instructing the jury that it could award damages in the amount of *either* the cost of repair *or* the diminution in property value. We review the district court's jury instructions as a whole to determine whether they were misleading or imparted an insufficient understanding of the law. *Bowman v. Koch Transfer Co.*, 862 F.2d 1257, 1263 (6th Cir. 1988). After careful review, we conclude that this instruction was erroneous; that because of this error, the instructions as a whole were misleading and imparted an insufficient understanding of a critical area of the law; and that a new trial is therefore necessary to decide the proper measure of damages.

The proper remedy for a breach of contract is compensatory damages based on actual harm. *Hogan v. Long*, 922 S.W.2d 368, 371 (Ky. 1995). The Kentucky Supreme Court held in *Ellison v. R & B Contracting*, 32 S.W.3d 66, 69 (Ky. 2000), an action for trespass, that where injury to real estate is claimed, compensatory damages may be measured by either (1) cost of repair or (2) diminution in value. However, the Kentucky Supreme Court made clear in *Ellison* that these are not equally available options in all circumstances; in one sense, diminution in value is really just an upper limit on cost of repair. *Id*. at 70. The Court explained:

> We reiterate today, [] that cost[s] to repair damages are available only where the factfinder determines that . . . the property may be restored at an expense less than the total amount by which the injury decreased the property's value.

> Questions regarding the cost of repairing a particular injury to real estate and the extent of any diminution in fair market value of the real estate as a result of an injury are questions of fact. Accordingly, we hold that in future cases where a claimant seeks compensation in the form of repair costs for an injury to land, trial courts shall

7

require the jury to find whether the injury may be repaired at a cost less than the diminution in the value of the property, and, if the jury finds otherwise, limit the claimant's recovery to the diminution in the value of the property.

*Id*. at 70 (footnotes omitted). The case presently before this court differs from *Ellison* in two respects: first, this action sounds in contract, not in tort, and second, Mr. Lichtefeld did not seek repair costs in excess of the diminution in value, but rather, sought diminution in value without regard to repair costs. So, the question – as Mactec asserts – is whether, in an action for breach of a real estate lease resulting in non-permanent injury to the real estate, the *Ellison* "lesser-of" rule applies to limit the plaintiff's damages to the lesser of the cost of repair or the diminution in value.[4]

In diversity cases, when a state supreme court has not yet addressed an issue, we must predict how that court would decide it. *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). Although the Kentucky Supreme Court has not addressed the specific question before us here, in *Ellison*, 32 SW.3d at 71, it endorsed a model jury instruction directing the jury to award the "lesser of" the cost of repair or the diminution in value in the tort context. Of course, this is not unusual; this is the traditional approach to such situations. *See, e.g., Newsome v. Billips*, 671 S.W.2d 252, 255 (Ky. App. 1984) ("However, repair is unreasonable when its cost exceeds the difference in the before and after value."); *Island Creek Coal Co. v. Rodgers*, 644 S.W.2d 339, 345 (Ky. App. 1983) ("The cost of repair is 'reasonable' only if it does not exceed the difference in fair market value before and after the injury."); *Edwards & Webb Constr. Co., Inc. v. Duff*, 554 S.W.2d 909, 911 (Ky. App. 1977); *Burkshire Terrace. Inc. v. Schroerlucke*, 467 S.W.2d 770, 772 (Ky. 1971) ("If the costs of restoration exceed the diminution in value they are presumptively unreasonable.").

---

[4]A different analysis applies to cases involving permanent harm to real property or harm to unique or special purpose properties. *See, e.g., Trinity Church in the City of Boston v. John Hancock Mut. Life Ins. Co.*, 502 N.E.2d 532, 533 (Mass. 1987).

Courts routinely refuse to engage in economic waste (i.e., award repair costs when the diminution in value is something less), as in *Ellison*, and similarly refuse to award plaintiffs a windfall (i.e., award diminution in value when the cost of repair is something less). For example, in a typical case in which the objective is to restore the plaintiff to his rightful position, and that position is defined by the property in its "best condition," it would be entirely illogical to find that the diminution in value is greater than the cost of repair. If something can be repaired to its "best condition" for a certain dollar amount, then that amount is the maximum diminution in its value. In the present case, the contractual agreement was that Mactec would maintain the HVAC system and the property in a neat and orderly condition, normal wear and tear excepted. There were no specific requirements as to how Mactec would fulfill this promise.[5] Therefore, we can reasonably predict that the Kentucky Supreme Court would apply the lesser-of rule to the present case.

In the present case, however, the district court refused to apply the lesser-of rule and instead, in Jury Instruction Number 11, granted the jury discretion to decide between two alternatives. The jury, after finding Mactec liable to Mr. Lichtefeld for breaching the lease, awarded Mr. Lichtefeld $175,000 in damages. In so doing, the jury also completed the following verdict form:

> Will the jury please complete either A or B below:
> A. We, the Jury, find in favor of the plaintiff, Paul Lichtefeld, and award him the sum of $__[**175,000**]__ (not to exceed $300,000) in damages for the difference in fair market value as defined in paragraph 2 of Instruction 11.
> - - - - - OR - - - - -
> B. We the jury find in favor of the plaintiff, Paul Lichtefeld, and award him the following:

---

[5]We recognize that parties may contract for a specific type of repair or level of maintenance, and under such an agreement, each party would be entitled to the benefit of its bargain. Similarly, parties may contract for a specific measure of damages or liquidated damages for the failure to fulfill certain conditions to the contract. Neither of these circumstances is present in this case, however, and we are presented with only a situation in which the court must attempt to return the plaintiff to his rightful position, without any contractual directive as to how to do so.

Cost of restoring the premises as defined in paragraph (1)(a) of Instruction 11 (not to exceed $47,730.00). $ _____

Cost of restoring the Heating and Air Conditioning system, as defined in paragraph (1)(b) of Instruction 11, (not to exceed $51,005.00). $ _____

Total $ _____

From this, it is at least clear that the jury's award was based on a diminution in value.

Under *Ellison*, "trial courts shall require the jury to find [1] whether the injury may be repaired at a cost less than the diminution in the value of the property, and, [2] if the jury finds otherwise, limit the claimant's recovery to the diminution in the value of the property." *Ellison*, 32 S.W.3d at 70. Therefore, the instruction and verdict form used by the district court in this case gave the jury an incorrect understanding of the law and misled the jury into finding one but not the other measure of damages, when the correct law necessitated that the jury find both.

So, we must conclude that the district court erred. *See Bowman*, 862 F.2d at 1263. The question that now presents itself is whether we can resolve this error on the record before us, or if we must remand this case to the district court for a new trial on the measure of damages.

On the one hand, the jury awarded $175,000 for diminution in value, and if not for this peculiar verdict form, we might find from the evidence in the record (e.g., $184,000 to restore the building's interior and $217,000 to replace the HVAC system) that the jury could have reasonably found the cost of repair to exceed this diminution in value, which would provide for a presumptively correct outcome in spite of the incorrect instruction. *See* Fed. R. Civ. P. 61 (harmless error). Under such reasoning, the outcome would comply with the lesser-of rule. However, we cannot presume the jury found the cost of repair to exceed $175,000 because the verdict form explicitly states that the costs of repair are not to exceed $47,730 and $51,005 ($98,735 total). Therefore, if the jury followed instructions, as we must presume it did, then it could not have found a cost of repair in

10

excess of $98,735, and the award of $175,000 would not comply with the lesser-of rule.

On the other hand, we might assume from the verdict form that the actual cost of repair proven at trial was $98,735 and, based on that assumption, reduce the verdict to this amount and thereby comply with the lesser-of rule. However, further review of the genesis of this verdict form demonstrates that such an assumption would be improper. These two very specific "not-to-exceed" values on the verdict form ($47,730 and $51,005) appear only in a March 6, 2001, letter from Easter Seals to Mactec, which was created from Easter Seals' initial inspection of the building during its negotiations with Mr. Lichtefeld. Although the letter was admitted as an exhibit at trial, it was part of a group of stipulated exhibits and was not authenticated for the purpose of proving repair costs. This letter was introduced as evidence that Easter Seals had documented the damages to the building before entering negotiations for purchase. In fact, neither party ever suggested or admitted that the $47,730 and $51,005 values were representative of actual repair costs. Mr. Lichtefeld testified that these values were <u>not</u> representative, and the Easter Seals CEO dismissed the estimates, saying "this is kind of a joke." Although Mactec's witness did not testify about this letter or these values at trial, Mactec exclaims in its brief on appeal that "these estimates are inherently unreliable." Most importantly, in using these numbers on this verdict form, the court overruled Mr. Lichtefeld's repeated objections:

> [Court]: However, when we get to verdict form one, we have to talk about the amounts which the verdict cannot exceed. The fair market value measure is $300,000 by agreement.
> Correct?
>
> [Lichtefeld]: Yes.[6]

---

[6]Although the $300,000 "not-to-exceed" amount for diminution in value is also questionable, Mr. Lichtefeld's attorney conceded this number at trial and did not object, so we will not address it here.

[Court]:        Okay.

[Lichtefeld]:   Maximum.

[Court]:        However, the maximum of restoring the heating and air conditioning system and the maximum of restoring the premises, [Lichtefeld] argued should be the amounts spent by [] Easter Seals. The Court rejects that, because that happened under a different landlord with different standards and criteria and that proof of what Easter Seals spent after the transaction is not relevant.

What is relevant and the amounts the Court will use are the estimates on the attachment to Exhibit 21 [the March 6, 2001 letter], which lay out Easter Seals' statement to Paul Lichtefeld, a total cost of restoring the premises of $47,730, and it's a total cost of repairing the HVAC system of $51,005.

That's a summary of the objections and the Court's ruling. Are there [] any other objections?

[Lichtefeld]:   Yes. Judge, I strenuously object to using the amount off that document. And here's why: Because as you said earlier, the law says that Plaintiff can recover either one. I'm not asking the jury for cost to repair.

[Court]:        Well, I understand you're not. But all I want to know - - I'm going to give the jury instructions on these various measures of damages and let the jury decide to what extent your client has been actually damaged. So we have already passed that point.

My question is what proof other than that sheet that's attached to the letter in Exhibit 21 supports any amounts to put into these 'not to exceed' parentheticals?

[Lichtefeld]:   You overruled the first argument. The answer is nothing.

[Court]:        Okay.

[Lichtefeld]:   Because I'm not asking the jury for those damages.

[Court]:        Right, yeah. I was just trying to summarize.

[Lichtefeld]:   And if the Plaintiff is not asking for something, how could the Court instruct the jury that they can give me something I'm not asking for?

[Court]:        I understand your argument. But you are asking for actual damages, and I've elected to define actual damages the way - - the various ways the law defines that, and let the jury pick the way.

So the only proof that supports your cost of repair approach - - or the cost of repair approach is that sheet.

[Lichtefeld]:   Your honor, you're forcing me to - -

[Court]:        Well, wait. If you have anything new to add, we'll go there. I was just now trying to summarize everything. But I've already ruled on it.

Anything else?

12

. . .

[Lichtefeld]:  Could I make one comment more, Judge, about this?

[Court]:  Yes.

[Lichtefeld]:  I would ask that you - - I mean, I'm not going to argue this proof to the jury that I want these damages. I think they may wonder where did this $48,735 come from.

[Court]:  I'll tell them; I'll tell them. That's from Exhibit 21 on that sheet, that if they choose to decide that that is the measure of damages. They may decide that that's the fairest way to measure how your client has actually been damaged. And he put on proof of fair market value and nothing else. The only other thing I have is this, so this sheet that's Exhibit 21 attachments.

[Lichtefeld]:  With all due respect, I object and think its in error.

[Court]:  I understand. But I have already ruled on that.

Based on the foregoing, we cannot reasonably assume that the actual cost of repair proven at trial was $98,735, nor can we reduce the verdict to that amount in order to comply with the lesser-of rule. At least three problems are evident in the quoted exchange. First, the district court mistakenly concluded that the amount Easter Seals spent to repair the building was not relevant. However, no matter who spent it, the money spent for those repairs was the only actual measure of the costs to restore the building. For the purpose of proving what Mr. Lichtefeld would have had to spend to restore the building, the Easter Seals amount was not only relevant, it was the only number actually attested to be representative. The second problem was that the court mistakenly concluded that the values on the March 6, 2001, letter were relevant, even though the letter was not introduced or used to establish the cost of repairs, and those numbers were refuted during testimony. Mr. Lichtefeld did not spend any money on repairs - - not the money listed in the March 6, 2001, letter ($98,735) and not the money spent by Easter Seals ($401,000). The question for the jury was, what would it have cost him to restore the building, and as between these two pieces of evidence,

13

one is no more reliable than the other. These two conclusions, taken together, are arbitrary and inexplicable. Third, the court ruled prior to the trial that the proper measure of damages was either the cost of repairs or the diminution in value and, during the colloquy on jury instructions quoted above, acknowledged that it "elected to define actual damages . . . the various ways the law defines [them], and let the jury pick the way." In doing so, the court not only erred in failing to instruct the jury using the rule of *Ellison*, but also encouraged Mr. Lichtefeld to omit any proof of repair costs and seek to prove only diminution in value.

As a result of these errors, the jury had neither the evidence necessary to determine the costs of repair nor a correct explanation of the law it must apply to determine damages. Based on a full review of the record, it appears that Mr. Lichtefeld could prove at least $184,000 to restore the building's interior and $217,000 to replace the HVAC system (ignoring other contract damages such as incidental costs or lost rental value). This testimony establishing those amounts was unrebutted, but just as Mr. Lichtefeld was not trying to prove costs of repair, Mactec was not trying to disprove them. Our review of the record yields no basis for limiting the costs of repairs to the amounts specified on the verdict form. Because the amount of damages is not a decision for this court, but a decision for the jury, we conclude that under these circumstances, a new trial is required on the issue of damages. We therefore remand this case to the district court for a new trial on this issue, with instructions that the "trial court[] shall require the jury to find [1] whether the injury may be repaired at a cost less than the diminution in the value of the property, and, [2] if the jury finds otherwise, limit the claimant's recovery to the diminution in the value of the property." *See Ellison*, 32 S.W.3d at 70.

**IV.**

14

For the foregoing reasons, we **AFFIRM** the judgment of the district court as to the first five issues, including liability, but we **REVERSE** on the measure of damages and **REMAND** this case to the district court for further proceedings consistent with this opinion.