JAMES A. GLAVIN, individually and as trustee,[1] *vs.* BRUCE ECKMAN & others.[2]

No. 07-P-383.

Dukes. January 3, 2008. - March 3, 2008.

Present: GELINAS, GRASSO, & COWIN, JJ.

*Agency,* Independent contractor. *Real Property,* Removal of timber. *Damages. Practice, Civil,* Damages. *Evidence,* Expert opinion. *Witness,* Expert.

In a civil action brought by a property owner against his neighbors pursuant to G. L. c. 242, § 7, which defines liability for the wrongful cutting of trees, the evidence was sufficient for the jury to conclude that the defendants directed the scope of the work performed by a landscaper whom they retained to maximize their view of the ocean, and therefore were liable for the landscaper's actions in cutting down, without license from the plaintiff, ten large, mature oak trees that were on the plaintiff's land. [316-317]

In the circumstances of a case where the plaintiff sought recovery under G. L. c. 242, § 7, for the wrongful cutting of trees on his property by the defendants' landscaper, the judge properly permitted the jury to award restoration costs to the plaintiff, where evidence that the defendants' actions destroyed the special value that the land and its stand of mature oak trees held for the plaintiff supported the inference that diminution in the market value of the plaintiff's property was not a fair and adequate measure of his damages. [317-320]

In a civil action for the wrongful cutting of trees, the unique value of the trees to the plaintiff, their integral role in his intended landscaping project, and properly admitted expert evidence, consisting of testimony from the plaintiff's arborist as to restoration costs [321-322], indicated that the jury's award was reasonable [320-321]; moreover, the statutorily mandated trebling of damages for the cutting of trees on another's land without good reason to believe that such actions were lawfully authorized did not render such damages unreasonable [322].

CIVIL ACTION commenced in the Superior Court Department on October 25, 2002.

The case was tried before *Judith Fabricant*, J.

*Ethan Warren* for Bruce Eckman & another.

[1]Of Next Door Realty Trust.

[2]Shelly Eckman, Jon R. Fragosa, and Three Trees, Ltd.

*John A. Amabile* for Jon R. Fragosa & another.

*E. Douglas Sederholm* for the plaintiff.

GRASSO, J. Looking to enhance their view of the ocean, Bruce and Shelly Eckman hired Jon R. Fragosa and his landscaping company, Three Trees, Ltd. (Fragosa), to top and remove the trees that stood in the way. Fragosa improved the Eckmans' view by cutting down ten large, mature oak trees standing on the property of a neighbor, James A. Glavin, without Glavin's permission.

After trial on Glavin's claim against the Eckmans and Fragosa for the wrongful cutting of his trees, see G. L. c. 242, § 7,[3] a jury rendered a special verdict in favor of Glavin. The jury found that (1) Fragosa wilfully cut trees on Glavin's land; (2) Fragosa did not have good reason to believe that he was lawfully authorized to cut the trees on Glavin's land; (3) the Eckmans wilfully cut trees on Glavin's land by directing Fragosa to do so; and (4) the Eckmans did not have good reason to believe that they were lawfully authorized to cut the trees on Glavin's land. The jury assessed $30,000 in damages as "the reasonable cost of restoring the property as nearly as reasonably possible to its original condition."[4] The judge trebled those damages as required by the statute.

On appeal, the issues before us are whether (1) the restoration cost is an appropriate measure of damages; (2) the judge erred in admitting expert testimony; and (3) trebling of the restoration cost damages renders such damages unreasonable. Separately, we consider the Eckmans' contention that they cannot be held liable for the acts of Fragosa, an independent contractor. We affirm.

---

[3]G. L. c. 242, § 7, provides:

> "A person who without license wilfully cuts down, carries away, girdles or otherwise destroys trees, timber, wood or underwood on the land of another shall be liable to the owner in tort for three times the amount of the damages assessed therefor; but if it is found that the defendant had good reason to believe that the land on which the trespass was committed was his own or that he was otherwise lawfully authorized to do the acts complained of, he shall be liable for single damages only."

[4]The jury also found that the value of the trees cut, as cord wood, was $1,000.

1. *Facts.* From the evidence at trial, the jury could have found the following. Glavin, the Eckmans, and a third individual, named Bea Gentry, own four roughly parallel rectangular parcels of land in the Aquinnah section of Martha's Vineyard, a place of natural beauty. Glavin owns the two westernmost lots. The Eckmans own the most easterly lot. Between the Glavin and Eckman lots is the lot owned by Gentry. By virtue of its greater elevation, the Eckmans' lot has a southwest view to the ocean across the adjacent lots.

Glavin lives with his wife and children in a house that he built on the westernmost lot in 1985. In 1990, he bought the adjoining 1.7-acre lot directly to the east of his house lot. A significant feature of the adjoining lot was a wetland about one-half acre in size that rose to a knoll containing a stand of ten large oak trees that were ideally situated to provide shade and serve as a backdrop to a pond that Glavin planned to restore at the edge of the wetland. A general contractor of considerable experience, Glavin had previously converted wetlands into ponds at least a half dozen times.

When building their vacation home in 1996, the Eckmans asked Glavin for permission to cut the stand of trees on Glavin's property to enhance their view of the ocean. Glavin refused their request, indicating that he had personal reasons for not cutting the trees. Subsequently, in 2001, the Eckmans hired Fragosa to trim or cut down the trees that blocked their view of the ocean. They directed Fragosa to clear as much as possible to enhance their water view, a job that Fragosa characterized as opening the view "to the max." When discussing the job, the Eckmans and Fragosa did not walk the Eckmans' property, but stood on the Eckmans' back deck overlooking the area to be trimmed.

It was readily apparent that most of the trees the Eckmans wanted removed were not on their property.[5] When setting about the job, Fragosa inquired of Gentry, who granted him permission to cut and trim trees on her lot. Although Fragosa obtained Gentry's permission, he did not ascertain the boundaries of her

---

[5]Neither Fragosa nor the Eckmans contend that the trees cut were on Eckmans' property; that the cutting was not wilful; that they were licensed by Glavin; or that they had good reason to believe the trees were on the Eckmans' property.

property relative to the Eckman or Glavin properties, nor did he seek permission from Glavin or any other property owners in the area.

In cutting down the trees necessary to open the Eckmans' view, Fragosa strayed fifty to one hundred feet across the unmarked boundary between the Gentry and Glavin lots and cut the stand of mature oaks on Glavin's lot. The trees that Fragosa cut ranged from eleven to thirty inches in diameter at the stumps.

2. *The Eckmans' liability.* Fragosa does not contest the jury's findings of liability against him.[6] The Eckmans, however, contend that Fragosa was an independent contractor for whose acts they cannot be held liable absent a finding that they directed him to cut down the trees. They maintain that the evidence was insufficient for the jury to conclude that they so directed Fragosa.

We disagree.[7] The jury could permissibly conclude that the Eckmans, not Fragosa, defined the scope of the work to be performed by virtue of their retaining Fragosa to cut trees so as to maximize their view to the ocean. While Fragosa retained control over the manner in which the trees would be cut — whether by ax, hand saw, chain saw or other method — the Eckmans retained the ultimate control over the scope of Fragosa's work, cutting those trees that impeded the Eckmans' view. Photographs taken from the Eckmans' deck after the cutting and admitted in evidence show a distinct gap in the treetops that Glavin identified as the area where his trees had stood prior to being cut by Fragosa. The jury were free to disbelieve the Eckmans' and

---

[6]Fragosa argues only that restoration cost damages were inappropriate and that the trebling of such damages rendered the damages unreasonable.

[7]The Eckmans concede the trial judge properly instructed the jury that the Eckmans would be liable if the jury found that the Eckmans directed Fragosa to cut trees on Glavin's property. Where the parties agree that liability attaches if the Eckmans directed Fragosa, and the evidence is sufficient to prove as much, we need not inquire further into whether the Eckmans would be liable even were Fragosa an independent contractor. See *Corsetti* v. *Stone Co.*, 396 Mass. 1, 9-11 (1985) (person who hires independent contractor to do certain work may be liable for tortious conduct of independent contractor if he retains control of part of work performed); *O'Brien* v. *Christensen*, 422 Mass. 281, 285 n.9 (1996) (possessor of land who entrusts work on land to independent contractor subject to same liability as though he had retained work in his own hands).

Fragosa's testimony that no direction was given to cut those particular trees. Indeed, in light of the strong evidence that Glavin's trees were the chief impediment to the Eckmans' view, and the undisputed evidence that the Eckmans had previously requested and been denied permission from Glavin to remove the trees that impeded their view, the jury could permissibly infer that the Eckmans had directed Fragosa, explicitly or implicitly, to cut down those particular trees regardless of whether the trees stood on Glavin's land or elsewhere.[8] The jury could also permissibly conclude that having been denied permission from Glavin, the Eckmans decided to resort to self-help and enlisted Fragosa as a dupe or a willing accomplice.

3. *Restoration costs as a measure of damages.* The defendants maintain that the judge erred in permitting the jury to award a restoration cost measure of damages, rather than damages measured by the value of the timber wrongfully cut, or by the diminution in market value of the property as a result of the cutting. See *Davenport* v. *Haskell*, 293 Mass. 454, 456-457 (1936); *Larabee* v. *Potvin Lumber Co.*, 390 Mass. 636, 643 (1983). We disagree.

General Laws c. 242, § 7, specifies that one who wilfully and without license cuts the trees of another shall be liable in tort "for three times the amount of the damages assessed therefor." "The statute does not prescribe how the damages shall be measured." *Larabee, supra* at 643. While the most common measures of damages are (1) the value of timber wrongfully cut,

---

[8]Negligence by the Eckmans and Fragosa in determining the boundaries of Gentry's and Glavin's property would not avail them, as liability attaches under the statute when the cutting of the trees on the land of another is wilful and without license. That Fragosa cut trees on Glavin's land wilfully and without license from Glavin was not disputed.

Moreover, absent proof that the defendants had good reason to believe that they were otherwise lawfully authorized to cut the trees by virtue of permission from Gentry, the statute requires the damages owing to the wrongful cutting to be trebled. See *Larabee* v. *Potvin Lumber Co.*, 390 Mass. 636, 643 n.6 (1983) (if defendant reasonably thought he was authorized to cut trees he shall be liable for single damages only). On ample evidence, the jury could, and did, conclude that having failed to ascertain the boundaries of Gentry's and Glavin's properties, neither the Eckmans nor Fragosa had good reason to believe that Gentry could lawfully authorize them to cut the trees that blocked the Eckmans' view.

or (2) the diminution in value of the property as a result of the cutting, see *ibid.*, we discern no limitation in the statute to these measures of damages. Indeed, to limit damages to these measures would encourage, rather than deter, wrongdoers from engaging in self-help in circumstances such as when an ocean or other view is desired. The timber wrongfully removed may amount to no more than a single tree; and its removal may even improve, not diminish, the market value of the property. Yet the wrongful cutting may represent a significant loss to the property owner and a significant gain to the wrongdoer even where the value of the timber cut is negligible, or the diminution in value of the property owing to the cutting is minimal or nonexistent. So to limit the damages would permit a wrongdoer to rest assured that the cost of his improved view would be no more than treble the value of the timber cut even where the change wrought to his neighbor's property by the wrongful cutting, as here, is significant. The statute does not so confine a property owner's redress for the wrongdoing of an overreaching neighbor.

Although diminution in market value is one way of measuring damages, "market value does not in all cases afford a correct measure of indemnity, and therefore is not therefore 'a universal test.' " *Trinity Church* v. *John Hancock Mut. Life Ins. Co.*, 399 Mass. 43, 48 (1987), quoting from *Wall* v. *Platt*, 169 Mass. 398, 405-406 (1897). Accordingly, "[r]eplacement or restoration costs have also been allowed as a measure of damages . . . where diminution in market value is unavailable or unsatisfactory as a measure of damages." *Trinity Church, supra* at 49. See *Heninger* v. *Dunn*, 101 Cal. App. 3d 858, 864-865 (1980) (applying restoration cost measure in damage to trees). This is but another way of recognizing "that more complex and resourceful methods of ascertaining value must be used where the property is unusual . . . and where ordinary methods will produce a miscarriage of justice." See *Trinity Church, supra* at 49, quoting from *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.*, 335 Mass. 189, 195 (1956).

The judge, as gatekeeper, has broad discretion to determine whether evidence other than fair market value is relevant to the question of damages. See *Massachusetts Port Authy.* v. *Sciaba Constr. Corp.*, 54 Mass. App. Ct. 509, 514 (2002). Here, the

judge did not abuse that discretion in concluding that diminution in market value was not a fair and adequate measure of the damages that Glavin suffered by the wrongful cutting of his trees. See *id.* at 515. Glavin had no desire to sell the property. Indeed, his plan was to hold on to the lot and utilize its mature oak trees to provide shade for a pond he planned to create from the existing wetlands, and as a backdrop to a tranquil view from his house lot. Regardless whether the planned restoration would increase the value of the lot as a building site and regardless whether the wrongful cutting had an impact on the market value of the lot, elimination of the trees wrought a significant change to Glavin's property. The trees represented decades of natural growth that could not easily be replicated. Moreover, any diminution in market value arising from the wrongful cutting was of less importance than was the destruction of the special value that the land and its stand of mature oak trees held for Glavin.

In such circumstances, the evidence supported the inference that diminution in market value was not a fair and adequate measure of Glavin's damages, and the judge did not err in permitting the jury to award restoration costs as an adequate measure of damages. See *id.* at 514. A plaintiff may opt for either the value of the timber cut or the diminution in value of his property as the measure of damages under the statute, see *Larabee* v. *Potvin Lumber Co.*, 390 Mass. at 643, and when the latter measure does not fairly measure his damages, he may permissibly opt for restoration cost damages. It was not necessary for Glavin to show the impossibility of introducing evidence of fair market value. See *Massachusetts Port Authy., supra.*

When applying a restoration cost measure of damages, a test of reasonableness is imposed. "Not only must the cost of replacement or reconstruction be reasonable, the replacement or reconstruction itself must be reasonably necessary in light of the damage inflicted by a particular defendant." *Trinity Church, supra* at 50. Here, the evidence supported the inference that restoration of Glavin's lot to its predamaged condition was reasonable and reasonably necessary in light of the damage inflicted by the defendants. The cutting down of ten mature oak trees was not a slight injury, and was wilfully undertaken by the defendants to achieve a previously denied view from their

property to the ocean. The cost of restoring the lot, while substantial, was not a "very large and disproportionate expense to relieve from the consequences of a slight injury." See *ibid.*, quoting from *Hopkins* v. *American Pneumatic Serv. Co.*, 194 Mass. 582, 584 (1907). Glavin's use of his property was neither uneconomical nor improper. Likewise, restoration of the property to its predamaged condition was neither uneconomical nor improper. See *Trinity Church, supra* at 50.

We also cannot say as matter of law that the jury erred in concluding that because direct restoration of the affected area was either physically impossible or so disproportionately expensive that it would not be reasonable to undertake such a remedy, $30,000 was "the reasonable cost of restoring the property as nearly as reasonably possible to its original condition" (emphasis omitted). *Id.* at 43, quoting from *Maloof* v. *United States*, 242 F. Supp. 175, 183 (D. Md. 1965) (applying restoration cost measure of damages to replace trees and vegetation). The jury's award was a reasonable determination from the evidence presented. See *Massachusetts Port Authy., supra* at 518. As discussed further below, this was a case where making an *actual* restoration would be uneconomical. Indeed, Glavin's expert recognized as much in his "years to parity" method of assessing the damages. The assessment of damages is traditionally a factual undertaking appropriate for determination by a jury as the representative voice of the community. See *Borne* v. *Haverhill Golf & Country Club, Inc.*, 58 Mass. App. Ct. 306, 320 (2003) (jury composed of persons from varying walks of life and experiences particularly suitable institution for assessing compensatory damages). Likewise, the jury are equipped to evaluate and eliminate any claimed damages that appear excessive. So long as the damages assessed represent a reasoned weighing of the evidence by the jury, fairly compensate the plaintiff for the loss incurred, and do not penalize the wrongdoer, the object of compensatory damages is accomplished. See *Burt* v. *Meyer*, 400 Mass. 185, 189 (1987) (compensatory damages measure fair monetary value of injury suffered); *City Coal Co. of Springfield* v. *Noonan*, 434 Mass. 709, 716 (2001) (compensatory damages are to be compensatory, and, in monetary terms, make the winner no less well off for the chase). Given the

unique value of the trees to Glavin, their integral role in his intended landscaping project, and the expert evidence as to the restoration costs, the jury's award cannot be said to be unreasonable. See *Massachusetts Port Authy.*, *supra* at 513 (party who suffers damage to real property proximately caused by acts of another entitled to fair compensation for his loss).

We disagree with the defendants that the restoration cost damages awarded by the jury provided Glavin with a windfall. See *id.* at 517. ("[C]are must be taken . . . not to permit the injured party to recover more than is fair to restore him to his position prior to his loss. He should not recover a windfall"). The defendants' tortious actions resulted in the elimination of ten large mature trees and effectively deprived Glavin of this feature of his property for his lifetime. Far from being a windfall, the damages were, at best, a necessary substitute for what nature would require decades to replace.

4. *The expert testimony supporting damages.* The judge did not err in permitting Glavin's expert arborist, Ellis Allen, to testify regarding the formula used to arrive at a replacement cost for the wrongfully cut trees. Allen, who had extensive experience in appraising the value of destroyed trees, offered unrebutted testimony that the replacement cost method was accepted within the community of professional arborists. Allen explained that where, as here, replacing trees of the size that were cut was technically feasible but practically unlikely given the size of the trees and survivability concerns, arborists have developed a method that accounts for the species, condition and age of the trees to be replaced. The method, known as cost-of-cure, involves determining the cost of planting trees and the estimated time for the replacement trees to grow to the size of the destroyed trees (years to parity). In arriving at his estimate of value, Allen assumed replacement trees that were three inches in diameter, adjusted (reduced) the cost of the replacement trees to reflect differences in condition between field grown and nursery grown replacement trees, and then estimated how long it would take a three-inch diameter tree to grow to the size of the trees that were cut. Using a growth rate of one inch in diameter for each four years of growth, Allen calculated the average years to parity for the destroyed trees. By applying an interest factor based on years to parity, Allen opined

that the total replacement cost of the destroyed trees was $56,369.

Charles Wiley, a landscape contractor and another of Glavin's experts, testified that the cost of delivering and planting three-inch diameter replacement trees would be $697 per tree, exclusive of the cost of the tree itself. Moreover, due to topography and wetland conditions, Wiley estimated that the cost of building a temporary access road necessary to plant the trees, removing the access road upon completion, and restoring the wetland after removal of the road was $57,300.

The defendants presented no countervailing expert testimony, arguing instead that replacement cost was not a permissible measure of damages and that because Glavin presented no evidence as to diminution in value of his property from the cutting, his sole available measure of damages was the value of the trees as timber. On the evidence before it, we cannot say that the jury's award of $30,000 was irrational.

5. *Trebling damages under G. L. c. 242, § 7.* The defendants argue that even were we to conclude that the damages awarded by the jury were reasonable, when trebled under G. L. c. 242, § 7, such damages are unreasonable. As noted previously, the restoration cost damages awarded by the jury fall within the range of what is reasonable. See *Trinity Church* v. *John Hancock Mut. Life Ins. Co.*, 399 Mass. at 50. The trebling of those damages "ineluctably flows from the plain language of the statute," *Brewster Wallcovering Co.* v. *Blue Mountain Wallcoverings, Inc.*, 68 Mass. App. Ct. 582, 608 (2007), and does not render the damages unreasonable. The mandated trebling of damages represents a legislative judgment as to the punitive measure required to dissuade wrongdoers. A court should not interfere in that determination. See *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 387 (1988) (court should not enter debate regarding legislative purpose made plain by Legislature); *Wiedmann* v. *The Bradford Group, Inc.*, 444 Mass. 698, 710 (2005) (treble damages are punitive in nature, authorized only where allowed by statute, and appropriate where defendant's conduct is outrageous or indifferent to rights of others).

*Judgment affirmed.*