Ferrara, John S., J.
This matter came on for hearing before the court on plaintiffs motion for assessment of damages after the defendant had defaulted by failing to answer plaintiffs Complaint. A hearing was conducted over two days, June 13 and 14, 2012, and at the request of the parties the court took a view of the subject parcels of land at 29 and 33 Burnap Street, Auburn, Massachusetts, on June 14, 2012.
FINDINGS OF FACT
The plaintiff, Gloria Hermanson (hereinafter, “Hermanson”) owned adjoining parcels of unimproved land on Burnap Street in Auburn, Massachusetts, *144 identified as Lots 1 and 2. Lot 1 was approximately four-tenths of an acre, and Lot 2 was about one-third of an acre. On May 19, 2000, Ms. Hermanson sold Lot 2 to the defendant, Mark Szafarowicz (“Szafarowicz”) for the sum of forty-seven thousand ($47,000) dollars. (Ex. 2.)
Both lots were heavily wooded and on a significant (about 15 degree) incline. The lots abut on a line running roughly northeast and southwest, with Lot 2, the easterly lot, being the “uphill” lot, and the slope running generally west southwest, from the right rear to the left front of the lots. (Exs. 3, 13.) Construction on either lot would necessarily require significant grading and back filling, and, depending on where on each lot excavation occurred, a retaining wall on the downhill side would likely be necessary to prevent erosion.
In 2002, the defendant began building a home on Lot 2, with cutting of trees, and excavation of an access road and the beginning of a foundation. The plaintiff confronted the defendant and advised him that he was on her property. There was disagreement on the location of the property line and some unpleasantness. Ms. Hermanson hired a surveyor and it was thereby confirmed that defendant had removed trees and conducted excavation on her property. The defendant testified at the hearing that “pins” marking the boundary lines were misplaced, and he had believed that he was within the bounds of his lot.
After Ms. Hermanson’s survey, defendant filled in the excavated area (or at least part of it) on Ms. Hermanson’s Lot 1, and began the construction at a location that was clearly within the bounds of his lot. Consistent with his previous plans, defendant constructed two small retaining walls at the western boundary of his lot, parallel to Ms. Hermanson’s lot, to prevent erosion, and he filled in a significant amount to create a more level area for a driveway and the residence. (Defendant’s Testimony; Ex. 6.)
Plaintiff testified and offered into evidence various plans prepared by Andiysick Land Surveying, including a plan that showed areas of alleged incursion by defendant identified as an area of excavation, an area where land had been “disturbed,” and the location of trees that were found to have been cut or were down. (Ex. 5.) The disturbed area covered approximately seven hundredths of an acre, or about seventeen percent of the area of the lot. The area of excavation spanned the property line, extending into Ms. Hermanson’s lot by about ten to twelve feet. There was testimony that eighteen trees were found to have been either cut down or on the ground; nine large trees with trunks six inches in diameter or greater, and nine small trees with trunks six inches in diameter or less. None of the trees were within the area of excavation. Three large trees were within the “disturbed area” and one was on the edge of that area. Other downed trees were throughout the lot, some quite distant from defendant’s area of excavation and the disturbed area.
Ms. Hermanson testified that no trees had been cut on Lot 1 in the years preceding defendant’s activities. The court credits Ms. Hermanson’s testimony, and finds that to her knowledge, no one else had been cutting down trees on the lot.
Plaintiff offered the testimony of William Curley, a licensed real estate appraiser and construction supervisor. Mr. Curley inspected Lot 1 on behalf of Ms. Hermanson on April 19, 2005. He also looked at photographs of the Lot taken in 2002 by Ms. Herman-son. (Ex. 7.) Mr. Curley testified that Lot 1 is one of the few building lots in the area that is not developed, and the only one not developed within one thousand feet of frontage on Bumap Street. He described the lot as a wooded lot, sloping from the right rear of the lot to the left front. Mr. Curley testified that when he walked the lot in 2005, he observed “scars from excavation about two-thirds of the way back on the lot, and that a number of trees had been removed.” He further testified to seeing areas of erosion. He returned to the property a number of times thereafter, including on one occasion with Plaintiffs Counsel and an arborist, David Hawkins.
In making his appraisal of the diminution in the property value of Lot 1, Mr. Curley relied upon the photos taken by Ms. Hermanson, and assumed that the property had been “unscathed” prior to the incursions thereon by defendant. He considered the market value of building lots as of April 19, 2002, and determined the value of that lot to have been seventy-five ($75,000) dollars, prior to any damage caused by defendant. He determined the fair market value of the lot after alleged damage to the lot by defendant, by subtracting from its prior value an estimated cost of replacing trees, constructing a retaining wall, and excavation and placing of fill on the lot. Mr. Curley considered cost estimates from reports prepared by an arborist, David Hawkins, and a construction expert, Pat Sarkisian, who Ms. Hermanson had retained. The reports suggested the following costs: construction of a retaining wall, ten to twelve thousand ($10,000-$12,000) dollars; replacement of trees by an arborist, thirty-two to thirty-three thousand ($32,000-$33,000) dollars; and excavation for leveling, constructing a wall, and adding fill of about ten to twelve thousand ($10,000-$12,000) dollars. Mr. Curley testified that he was not “convinced” that the property required a retaining wall, and that it was his original opinion that it did not. He concluded that the value of the lot had been diminished by forty thousand ($40,000) dollars, and that the value of the lot, without remediation, was thirty-five ($35,000) dollars.
The plaintiff called the arborist, David Hawkins, as a witness. Mr. Hawkins was hired by plaintiff in 2010. He examined a map provided by Ms. Hermanson, prepared by the surveyor, Mr. Andreysick, that showed *145 the location of trees that had been cut, and he had also inspected the lot, albeit eight (8) years after the fact. He found that there were some trees on the ground and some stumps still evident. Based on his inspection and the information provided, he determined that there had been eighteen trees that had been cut on the lot, nine large trees with a trunk diameter greater than six inches, and nine small trees with a trunk diameter less than six inches. The species of trees included white pine, red oak, black cherry, red maple, hickory, and Norway maple, and they were all species naturally occurring on the lot.
Mr. Hawkins testified that with respect to the valuation of cut trees, there were a number of potential approaches or methods used by arborists, including (1) the income approach; (2) the market approach; and (3) the replacement value. He testified that the income approach was not applicable because the woods were not being managed and the value of the wood from the trees would not be significant. He did not apply the market approach, the amount of diminution in the value of the property as a result of the loss of the trees, because he felt he was not qualified to do so. He testified that the market approach required the expertise of a real estate appraiser.
Mr. Hawkins used the replacement value of the trees. He acknowledged that it would be impractical to replace trees lost on the lot, because more trees than had been cut would have to be removed in order to gain access to the locations of downed trees. He also acknowledged that if trees were replaced, a subsequent owner might choose to cut some of them down to clear the lot for building.
Using a “trunk formula” method to calculate the “depreciated replacement cost” of the trees, Mr. Hawkins came to a valuation of about tweniy-eight thousand, nine hundred ($28,900) dollars for replacement of the larger trees, and two thousand fifty ($2,050) dollars for replacement of the smaller ones. This total of thirty-one thousand ($31,000) dollars was one of the figures used by William Curley in his calculation of the diminished fair market value of the lot. A report prepared by Mr. Hawkins with his calculations was admitted as Exhibit 11.
On cross examination, Mr. Hawkins acknowledged that the lot was a dense, unmaintained wooded lot, that none of the trees cut were “ornamental” trees or trees placed for landscape purposes, and that smaller trees had re-grown where the other trees had once stood.
The defendant, Mark Szafarowicz, testified that he had purchased Lot 2 from Ms. Hermanson in 2000 for forty-seven thousand ($47,000) dollars, and that he had begun excavation of the lot in 2002, to build his own home there. He acknowledged having begun excavation for the foundation of his house in an area that was partially on her land. He testified that he had done so because he believed he was on his property, the pins marking the boundary lines between the lots had been misplaced. The court credits Mr. Szafarowicz’s testimony on this point, because it would have been foolhardy for him to have knowingly placed his home partially on Lot 1; he would have understood that it might later have to be de-constructed.
Mr. Szafarowicz testified that Ms. Hermanson did advise him at some point that he had begun building too close to her property line. She commissioned a survey that confirmed her position, and he filled in the partial excavation and resumed excavating wholly on his own lot. He testified that he had health issues that interfered with and delayed construction of his home. He ceased work in 2002, and resumed in 2004. In 2004, he did some further excavation, constructed two small retaining walls, brought in significant quantities of necessary fill, stones and gravel, and began pouring the foundation.
Szafarowicz testified that in the course of doing work in 2002 and 2004, he cut down about twenty-five (25) trees and believed almost all were on his property. He testified that when he removed trees, he did remove the stumps. He testified that he knowingly cut down only one tree that was on Ms. Hermanson’s lot because it was decaying and falling. The tree he cut down was about eight feet from his actual property line, as later determined by Ms. Hermanson’s surveyor. A photograph taken by Ms. Hermanson in 2002 does show a tree that had been on her property that was cut down, that had been rotting in its center. (Ex. 4A.)
Szafarowicz testified that he did not believe he had cut other trees that were on Ms. Hermanson’s lot. He acknowledged seeing tree stumps and decaying logs on Lot 1, but did not know how long they had been there.
The defendant called his own real estate appraiser, Robert Tolland. Mr. Tolland went to the defendant’s lot in March 2008, and viewed the adjoining lot. He was asked to appraise Lot 1, retrospectively, to April 20, 2002. He appraised the lot as being worth sixty-seven thousand ($67,000) dollars at that time, and opined that whatever had been done by Mr. Szafarowicz had had no significant impact on its fair market value. He observed no significant tree removal, though he acknowledged on cross examination that from his vantage point looking into the dense woods, he may not have been able to see stumps or fallen logs. He testified that he went to the site one day after a significant rainfall, and saw no water flowing from Lot 2 to Lot 1, and no erosion or evidence of water run-off near the property line. Finally, he testified that he could not see evidence of the excavation that had been done on the property line.
The defendant offered into evidence a report of an arborist, Dennis Panu. (Ex. 14.) He was contacted by defendant’s counsel in March 2008, to appraise the value of trees cut down on the Hermanson lot. He also examined the lot to observe if sedimentation or deposit *146 of soil was occurring on the site as a result of tree removal. (Ex. 14.)
Mr. Panu observed the lot to be heavily wooded, with more than fifty (50) trees with trunks twelve (12") inches in diameter or greater, and many smaller trees. He observed “only one significant tree stump on the site that measured 27 inches in diameter . . .” He determined that the tree was a white pine, and that it had “extensive central decay” suggesting that the tree had been decaying from the inside out prior to its being cut down. (Ex. 14.) He found thirteen (13) smaller stumps on the property, ranging in size from one (1") inch in diameter to seven (7") inches in diameter. He testified that the stumps were of various species, consistent with the testimony of plaintiffs expert arborist, and noted that one, a Norway maple, is considered an invasive, non-native species that is listed on Massachusetts’ Prohibited Plant List.[1] (Ex. i4.)
Mr. Panu’s report describes the various methods of estimating the value of lost trees including the income approach (the value of timber), the depreciated cost approach (the cost to replace less depreciation, used by plaintiffs expert, Hawkins), and the market approach (the effect on the value of the lot, used by plaintiffs expert, Curley). Mr. Panu felt that trees cut down on this unmanaged lot would have little timber value. He eliminated the depreciated cost approach because it did not address the true value of the trees to the present or future owners. He noted that the optimal number of trees on a one-acre lot is twenty-nine (29), and he observed more than fifty (50) trees on this unmanaged, 0.43-acre lot; about four times the optimal number of trees. Thus, the value of the lost trees is diminished by "superadequacy” of the remaining trees. The abundance of trees resulted in lost trees having little landscape or aesthetic value.
Mr. Panu did a market approach analysis of the diminution in value of plaintiff s lot resulting from the loss of the one significant tree. Factoring in the large number of remaining trees, he concluded that the lot value was lessened by one hundred seventy-four dollars and fifty-seven ($174.57) cents. He did not find the lot’s value was reduced by loss of the smaller trees.
Mr. Panu’s report indicates that he saw no evidence of erosion or soil deposition onto Ms. Hermanson’s lot (now designated as 29 Burnap Street), and that “the embankment created by the driveway installation at 33 Burnap Street has been stabilized by vegetation and does not appear to extend beyond the boundaiy set pins.” (Ex. 14.)
The court viewed the lot on June 14, 2012. It is a densely wooded, unmanaged lot with many trees. There were a number of trees on the ground that appeared to have simply fallen from natural processes. There was at least one large tree lying on the ground with its root ball exposed. Some trees that were down were distant from defendant’s property and were outside of the “disturbed area” shown in the plans prepared by plaintiffs surveyor.
The photographs taken by Ms. Hermanson in 2002 show a significant number of trees down, some of which are on the defendant’s lot and some which may be on her lot. (Ex. 7.) It is hard to discern how many of the cut down trees were on Ms. Hermanson’s lot from the photos.
The Andreysick survey plan shows three large trees having been removed in the “disturbed area” in the plan, including near the first excavation site, and one large tree on the very edge of the “disturbed area.” It also shows fourteen trees down outside of the disturbed area, most of them smaller trees, many quite distant from defendant’s lot. The defendant would have had no reason for cutting those trees down and leaving them where they lie. Based on the photographs, the survey plan, and the court’s own view of the property, the court finds that the defendant likely cut down four (4) trees with a trunk diameter greater than six (6'j inches on Ms. Hermanson’s lot.
The court finds that the replacement of those trees is not necessary, and would add little to the overall value of the property.
The court walked the entire property, mindful of the survey plans showing previous areas of excavation and disturbed property. There were no significant residual holes or dramatic changes in the topography of the lot, nor areas of conspicuous erosion or water run-off near the property line, or elsewhere on the lot. Those observations were confirmatoiy of the opinions of defendant’s experts, Tolland and Panu. Therefore, the court finds that there is no need to construct a retaining wall on Ms. Hermanson’s property on the boundaiy with Mr. Szafarowicz’s property, nor is there a need for filling in depressions on the surface of the property resulting from any actions by defendant.
RULINGS OF LAW
Upon the entry of default, the factual allegations of plaintiff s Complaint are taken as true for the purpose of establishing liability. Multi Technology, Inc. v. Mitchell Management Sys., Inc., 25 Mass.App.Ct. 333, 334-35 (1988). The Massachusetts Rules of Civil Procedure, Rule 55(b)(2), provides that in all cases where a plaintiff is entitled to a default judgment, but the claim is not one for a sum certain or that can be computed with certainty, a judge must assess the damages.
G.L.c. 242, §7, provides that one who willfully and without license cuts down trees on another person’s property shall be liable “for three times the amount of the damages assessed therefore.” Where the cutting is not willful, single damages are to be awarded. Id. Consideration of whether or not a plaintiff is entitled to double or triple damages because of the willfulness of a defendant is not precluded by a default. It is treated as a question relating to damages, not liability. *147 Marshall v. Stratus Pharmaceuticals, Inc., 51 Mass.App.Ct. 667 (2001); Multi Technology, Inc., supra, at 336.
The most common measure of damages is either the value of the timber cut, or the resulting diminution in value of the property. A plaintiff is entitled to assert a claim for either value, whichever is highest. Larabee v. Potvin Lumber Co., 390 Mass. 636 (1983). The statute does not require that either of those measures of damages must be utilized, and in some instances a restoration cost measure of damages may be used “... where diminution in market value is unavailable or is an unsatisfactory measure of damages.” Glavin v. Eckman et al., 71 Mass.App.Ct. 313 (2008), citing Trinity Church v. John Hancock Mutual Life Ins. Co., 399 Mass. 43, 48 (1987). Restoration value is appropriate where other methods will produce a miscarriage of justice. It is used to reflect the special aesthetic, shade, or landscape value to the owner. Glavin, supra at 318-19. When the restoration value is used as a measure of damages, it requires utilization of a “reasonableness” test. “Not only must the cost of replacement or reconstruction be reasonable! the replacement or reconstruction itself must be reasonably necessary in light of the damage inflicted by a particular defendant.” Id., at 319.
In this case, restoration cost would not be an appropriate measure of damages. The land is not occupied by the owner, the trees lost had no special aesthetic or landscape value, there is a “superadequacy” of remaining trees on the heavily wooded lot, and the estimated valuation of the trees using that approach far exceeds the true consequences of the injury plaintiff suffered. Hopkins v. American Pneumatic Service Co., 194 Mass. 582, 584 (1907).
Since it appears undisputed that the timber value of the trees lost is negligible, the higher, and therefore more appropriate measure of damages is the diminution in market value approach. The plaintiffs expert places the diminution in market value of the lot at forty thousand ($40,000.00) dollars, but does so based on the cost of replacing trees, and the cost of putting in a retaining wall and fill. For the reasons stated above, that estimation of damages is unreasonable and not supported by the evidence.
The defendant’s real estate appraisal expert, Tolland, opined that there was no diminution in market value of Ms. Hermanson’s lot. However, defendant’s own expert arborist, Dennis Panu, opines in his report that the loss of a single tree, even on a heavily wooded lot, diminished the value of the lot by some amount. In this case, Panu valued the loss of one large tree on Ms. Hermanson’s lot at about one hundred seventy-five ($175) dollars.
The court finds Mr. Panu’s valuation of the loss of a tree on Ms. Hermanson’s lot to be more credible and reasonable than that given by plaintiffs expert. The court finds that the plaintiff has proven a loss of four significant trees at a value of one hundred seventy-five ($ 175) dollars each, a total of seven hundred ($700.00) dollars.
The court finds that the defendant’s action in cutting down those trees was not willful, and declines to treble the damages assessed for the loss of trees.
CONCLUSION
For the foregoing reasons, judgment shall enter for the plaintiff on Count I of her Complaint, and in accordance with her request for relief, it is declared that plaintiff holds title in Lot #1, 29 Bumap Street, Auburn, Massachusetts, free and clear of any claims of the Defendant, Mark Szafarowicz.
Further, the plaintiff is awarded damages in the sum of seven hundred dollars ($700.00).

 Plaintiffs expert put a depreciated “replacement value” on this prohibited species of tree of $291.00.